RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0283p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――――

IN RE: MCP NO. 165, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, INTERIM FINAL RULE: COVID-19 VACCINATION AND TESTING; EMERGENCY TEMPORARY STANDARD 86 FED. REG. 61402.

―――――――――――――――――――――――――――――――

MASSACHUSETTS BUILDING TRADES COUNCIL, et al. (21-7000); BENTKEY SERVICES, LLC (21-4027); PHILLIPS MANUFACTURING & TOWER COMPANY, et al. (21-4028); COMMONWEALTH OF KENTUCKY, et al. (21-4031); ANSWERS IN GENESIS, INC. (21-4032); SOUTHERN BAPTIST THEOLOGICAL SEMINARY, et al. (21-4033); BST HOLDINGS, LLC, et al. (21-4080); REPUBLICAN NATIONAL COMMITTEE (21-4082); ASSOCIATED BUILDERS AND CONTRACTORS, INC., et al. (21-4083); MASSACHUSETTS BUILDING TRADES COUNCIL (21-4084); UNION OF AMERICAN PHYSICIANS AND DENTISTS (21-4085); ASSOCIATED GENERAL CONTRACTORS OF AMERICA, INC., et al. (21-4086); NATIONAL ASSOCIATION OF BROADCAST EMPLOYEES & TECHNICIANS, THE BROADCASTING AND CABLE TELEVISION WORKERS SECTOR OF THE COMMUNICATIONS WORKERS OF AMERICA, LOCAL 51, AFL-CIO (21-4087); STATE OF MISSOURI, et al. (21-4088); UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING AND PIPE FITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL-CIO (21-4089); STATE OF INDIANA (21-4090); TANKCRAFT CORPORATION, et al. (21-4091); NATIONAL ASSOCIATION OF HOME BUILDERS (21-4092); JOB CREATORS NETWORK, et al. (21-4093); UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL/CIO-CLC, et al. (21-4094); SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ (21-4095); MFA, INC., et al. (21-4096); STATE OF FLORIDA, et al. (21-4097); AFT PENNSYLVANIA (21-4099); DENVER NEWSPAPER GUILD, COMMUNICATIONS WORKERS OF AMERICA, LOCAL 37074, AFL-CIO (21-4100); DTN STAFFING, INC., et al. (21-4101); FABARC STEEL SUPPLY, INC., et al. (21-4102); MEDIA GUILD OF THE WEST, THE NEWS GUILD-COMMUNICATIONS WORKERS OF AMERICA, AFL-CIO, LOCAL 39213 (21-4103); NATURAL PRODUCTS ASSOCIATION (21-4108); OBERG INDUSTRIES, LLC (21-4112); BETTEN CHEVROLET, INC. (21-4114); TORE SAYS LLC (21-4115); KENTUCKY PETROLEUM MARKETERS ASSOCIATION, et al. (21-4117); AARON ABADI (21-4133),

*Petitioners,*

*v.*

UNITED STATES DEPARTMENT OF LABOR, OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, et al.,

*Respondents.*

> Nos. 21-7000 /4027 /4028 /4031 /4032 /4033 /4080 /4082 /4083 /4084 /4085 /4086 /4087 /4089 /4088 /4090 /4091 /4093 /4092 /4095 /4094 /4096 /4097 /4099 /4100 /4101 /4102 /4103 /4108 /4112 /4114 /4115 /4117 /4133

On Petitions for Initial Hearing En Banc.

Multi-Circuit Petitions for Review from an Order of the U.S. Department of Labor, Occupational Safety and Health Administration, No. OSHA-2001-0007.

Decided and Filed:  December 15, 2021

Before:  SUTTON, Chief Judge; MOORE, COLE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER and MURPHY, Circuit Judges.

_____

**COUNSEL**

**ON PETITIONS FOR INITIAL HEARING EN BANC:** Benjamin M. Flowers, May Davis, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Christopher L. Thacker, Lindsey R. Keiser, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Clark L. Hildabrand, Brandon J. Smith, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, Brian Kane, Leslie M. Hayes, Megan A. Larrondo, OFFICE OF THE IDAHO ATTORNEY GENERAL, Boise, Idaho, Jeffrey A. Chanay, OFFICE OF THE KANSAS ATTORNEY GENERAL, Topeka, Kansas, Mithun Mansinghani, OFFICE OF THE OKLAHOMA ATTORNEY GENERAL, Oklahoma City, Oklahoma, Lindsay S. See, OFFICE OF THE WEST VIRGINIA ATTORNEY GENERAL, Charleston, West Virginia, Edmund G. LaCour Jr., OFFICE OF THE ALABAMA ATTORNEY GENERAL, Montgomery, Alabama, Charles E. Brasington, OFFICE OF THE ALASKA ATTORNEY GENERAL, Anchorage, Alaska, Drew Ensign, OFFICE OF THE ARIZONA ATTORNEY GENERAL, Phoenix, Arizona, John V. Coghlan, OFFICE OF THE MISSISSIPPI ATTORNEY GENERAL, Jackson, Mississippi, David M. S. Dewhirst, Christian B. Corrigan, OFFICE OF THE MONTANA ATTORNEY GENERAL, Helena, Montana, Nicholas J. Bronni, Vincent M. Wagner, OFFICE OF THE ARKANSAS ATTORNEY GENERAL, Little Rock, Arkansas, Henry C. Whitaker, Jason H. Hilborn, OFFICE OF THE FLORIDA ATTORNEY GENERAL, Tallahassee, Florida, James A. Campbell, OFFICE OF THE NEBRASKA ATTORNEY GENERAL, Lincoln, Nebraska, Anthony J. Galdieri, OFFICE OF THE NEW HAMPSHIRE ATTORNEY GENERAL, Concord, New Hampshire, Matthew A. Sagsveen, OFFICE OF THE NORTH DAKOTA ATTORNEY GENERAL, Bismarck, North Dakota, Ross W. Bergethon, OFFICE OF THE GEORGIA ATTORNEY GENERAL, Atlanta, Georgia, Thomas M. Fisher, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Thomas T. Hydrick, OFFICE OF THE SOUTH CAROLINA ATTORNEY GENERAL, Columbia, South Carolina, Samuel P. Langholz, OFFICE OF THE IOWA ATTORNEY GENERAL, Des Moines, Iowa, Elizabeth B. Murrill, OFFICE OF THE LOUISIANA ATTORNEY GENERAL, Baton Rouge, Louisiana, Judd E. Stone II, William F. Cole, Ryan S. Baasch, OFFICE OF THE TEXAS ATTORNEY GENERAL, Austin, Texas, Melissa A. Holyoak, OFFICE OF THE UTAH ATTORNEY GENERAL, Salt Lake City, Utah, Ryan Schelhaas, OFFICE OF THE WYOMING ATTORNEY GENERAL, Cheyenne, Wyoming,

Michael E. Toner, Thomas M. Johnson, Jr., Stephen J. Obermeier, Jeremy J. Broggi, Krystal B. Swendsboe, WILEY REIN LLP, Washington, D.C., Jeffrey C. Mateer, Hiram S. Sasser III, David J. Hacker, Jeremiah G. Dys, Lea E. Patterson, Keisha T. Russell, FIRST LIBERTY INSTITUTE, Plano, Texas, Cathleen A. Martin, John A. Ruth, NEWMAN, COMLEY & RUTH, P.C., Jefferson City, Missouri, Robert Henneke, Chance Weldon, TEXAS PUBLIC POLICY FOUNDATION, Austin, Texas, Matthew J. Clark, ALABAMA CENTER FOR LAW AND LIBERTY, Birmingham, Alabama, David A. Cortman, John J. Bursch, Matthew S. Bowman, Frank H. Chang, ALLIANCE DEFENDING FREEDOM, Washington, D.C., Ryan L. Bangert, Ryan J. Tucker, ALLIANCE DEFENDING FREEDOM, Scottsdale, Arizona, Richard J. Oparil, ARNALL GOLDEN GREGORY LLP, Washington, D.C., Grant J. Guillot, GRANT GUILLOT, LLC, Baton Rouge, Louisiana, Russell A. Newman, THE NEWMAN LAW FIRM, Brentwood, Tennessee, Christopher Wiest, CHRIS WIEST, ATTORNEY AT LAW, PLLC, Crestview Hills, Kentucky, James P. Sullivan, OFFICE OF THE GOVERNOR, Austin, Texas, Harmeet K. Dhillon, Ronald D. Coleman, Mark P. Meuser, Michael A. Columbo, DHILLON LAW GROUP INC., San Francisco, California, Robert Alt, THE BUCKEYE INSTITUTE, Columbus, Ohio, Patrick Strawbridge, CONSOVOY MCCARTHY PLLC, Boston, Massachusetts, for Petitioners. **ON RESPONSE:** Sarah E. Harrington, Michael S. Raab, Adam C. Jed, Brian J. Springer, Martin Totaro, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents.

The En Banc Court of the Sixth Circuit Court of Appeals delivered an order. MOORE, J. (pp. 4´–5), delivered a separate opinion concurring in the denial of the petitions for initial hearing en banc in which COLE, CLAY, WHITE, and DONALD, JJ., joined. SUTTON, C.J. (pp. 6–32), in which KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, JJ., joined, and BUSH, J. (pp. 33–42), delivered separate opinions dissenting from the denial of the petitions for initial hearing en banc.

---

**ORDER**

---

The court having received petitions for initial hearing en banc, and the petitions having been circulated to all active judges of this court, and less than a majority of the active judges of this court having voted in favor of initial hearing en banc,

IT IS ORDERED that the petitions be, and hereby are, DENIED.

---

**CONCURRING IN THE DENIAL OF INITIAL HEARING EN BANC**

---

KAREN NELSON MOORE, Circuit Judge, concurring in the denial of initial hearing en banc. This is an important case on an accelerated timeframe. And yet, many challengers proposed initial hearing en banc, an "often unproductive, always inefficient process." *See Mitts v. Bagley*, 626 F.3d 366, 370 (6th Cir. 2010) (Sutton, J., concurring in denial of en banc review). Because a three-judge panel of our court has already devoted significant time to this case, and because initial hearing en banc would subvert our normal process and require the full court to grapple with a sprawling record, I concur in the denial of initial hearing en banc.

Courts have repeatedly recognized that en banc hearing is an inefficient process. *See Mitts*, *supra*; *Hart v. Massanari*, 266 F.3d 1155, 1172 & n.29 (9th Cir. 2001) (calling en banc proceedings "unwieldy and time-consuming") (internal quotation omitted); *Bartlett ex rel. Neumann v. Bowen*, 824 F.2d 1240, 1243 (D.C. Cir. 1987) (Edwards, J., concurring in the denial of rehearing en banc) (noting that en banc rehearing "substantially delays the case being reheard"). This potential for delay "is magnified when there has been no prior panel consideration of a case." *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 211 F.3d 853, 854 (4th Cir. 2000) (Wilkinson, C.J., concurring in denial of initial hearing en banc).

This case shows the folly of initial hearing en banc. The massive docket and profusion of briefs, as in an especially complex matter before a district court, require focused consideration by a devoted panel. En banc hearing does indeed put "all hands on deck." C.J. Sutton Dissent at 11. In a case as important, accelerated, and briefing-filled as this one, however, gathering all hands on deck would have strained the resources of the sixteen active judges, requiring each of us to review the voluminous record and the relevant underlying legal doctrines. What's more, it would have done so for no discernable purpose: the case already sits before three thoughtful, independent judges on the panel who have spent the past weeks steeped in this matter. We properly leave the matter in their hands.

Our decisions "warrant the utmost respect when they are perceived by the public to have been reached in the most regular and careful manner." *Belk*, 211 F.3d at 856 (Wilkinson, C.J., concurring in denial of initial hearing en banc). I am relieved that this court adheres to those standards of regularity and care today.

---

## DISSENTING FROM THE DENIAL OF INITIAL HEARING EN BANC

---

SUTTON, Chief Judge, dissenting from the denial of initial hearing en banc. When much is sought from a statute, much must be shown. The Secretary of Labor asks a lot of the Occupational Safety and Health Act. He claims authority to issue an emergency rule, scheduled to go into effect on January 4, 2022, that will require roughly 80 million workers to become vaccinated or face a weekly self-financed testing requirement and a daily masking requirement. At the same time, he assumes authority to regulate an area—public health and safety— traditionally regulated by the States. If valid, the rule would nullify all contrary state and local regulations, as the power to regulate nationally is the power to preempt locally. Such broad assertions of administrative power demand unmistakable legislative support. The federal courts "expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance'" and to use "exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quotation omitted).

Congress did not "clearly" grant the Secretary of Labor authority to impose this vaccinate-or-test mandate. *First*, as a threshold matter, the Occupational Safety and Health Act gives the Secretary power to address only *occupational* health and safety risks. But it is by no means clear that this authority extends to all hazards that might affect employees at some point during the 16 hours of each weekday and the 48 hours of each weekend when they are not at work, whether the hazard arises from a coronavirus of one sort or another, a virulent flu, traffic safety, air pollution, vandalism, or some other risk to which people are equally exposed at work and outside of work. It is one thing to tell a worker to don a mask at the start of a hazard-filled shift and doff it at the end. It is quite another to tell a worker to vaccinate on the basis of a risk that exists whether he is on the clock or off and that amounts to a medical procedure that cannot be removed at the end of the shift. Confirming the point, the Secretary of Labor has never imposed a vaccine mandate or for that matter a vaccinate-or-test mandate on American workers.

The Act does not clearly give the Secretary power to regulate all health risks and all new health hazards, largely through off-site medical procedures, so long as the individual goes to work and may face the hazard in the course of the workday.

*Second*, even apart from the workplace-anchored scope of the Act, the Secretary of Labor's power to issue "emergency temporary standards" does not justify the first vaccinate-or-test mandate in federal labor law history. This emergency power extends only to "necessary" measures, namely measures indispensable or essential to address a "grave" danger in the workplace. But this set of preconditions does not apply (1) when the key population group at risk from COVID-19—the elderly—in the main no longer works, (2) when members of the working-age population at risk—the unvaccinated—have chosen for themselves to accept the risk and any risk is not grave for most individuals in the group, and (3) when the remaining group—the vaccinated—does not face a grave risk by the Secretary's own admission, even if they work with unvaccinated individuals. Countless lesser and more focused measures were available to the Secretary: targeting certain industries susceptible to high risk, focusing on protections for workers most vulnerable to the virus, and varying any requirements to account for the wide range of settings in which people work. A blunt national vaccine mandate for 80 million workers with little regard to the relevant employment circumstances—well-spaced or not, together or apart, high risk individuals or not, indoors or mainly outdoors—was not necessary under the Act, and Congress did not clearly say otherwise.

*Third*, the setting of these requirements—authority to set "emergency temporary standards" without complying with the notice-and-comment process—confirms the narrowness of this authority and its inapplicability here. Start with "emergency." The Secretary does not invoke this power based on a sudden revelation that the virus presents a serious health risk. How could he? He relies on something else—the increased availability of vaccines. That development, however, does not heighten health risks; it alleviates them—and it's hardly a new development anyway. What, moreover, is "temporary" about a vaccination? A reluctant or coerced vaccination cannot be undone if the Secretary changes course during the notice-and-comment process or if the proposed rule exceeds the Secretary's authority. All of the Secretary's

emergency decrees to date, even the ones invalidated by the courts, have involved truly temporary measures to protect workers from certain hazards at work until the notice-and-comment process ends. Ready access to free vaccinations may not have quelled the pandemic as quickly as the Secretary, or any of us, would like. But that reality does not justify, much less justify clearly, a sudden invocation of an emergency medical power at roughly the two-year anniversary of the pandemic merely because the Secretary determines that not enough Americans are vaccinated.

For my part, the resolution of this conflict between existing law and the Secretary's proposed policy is not particularly hard. What makes the case difficult are the ongoing challenges of the pandemic and the health-and-safety benefits of obtaining vaccinations. The challenges presented by the pandemic are serious, no one can deny. The record confirms what common experience shows—"that the public has a strong interest in combating the spread" of a virus that has prematurely ended over three-quarters of a million American lives. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. The record also shows the utility of vaccinations. The medical studies to date show that vaccinated individuals face fewer risks of getting the virus and, for those who still suffer breakthrough infections, fewer risks of serious symptoms or death. It is the rare federal judge, indeed the rare employee in the third branch, I suspect, who has not gotten the message.

But the issue here is not that simple. No matter the policy benefits of a well-intended regulation, a court may not enforce it if the agency's reach exceeds a statute's grasp. Once before, in the throes of another threat to the country, the executive branch claimed it needed to seize control of the country's steel mills as a "necessary" measure "to avert a national catastrophe." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952). But that threat, like this one, did not permit the second branch to act without authorization from the first branch. *Id.* at 588–89. As the Supreme Court recently explained in invalidating an eviction moratorium promulgated by the Center for Disease Control, "our system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. Shortcuts in furthering preferred policies, even urgent policies, rarely end well, and

they always undermine, sometimes permanently, American vertical and horizontal separation of powers, the true mettle of the U.S. Constitution, the true long-term guardian of liberty.

For these reasons and those elaborated below, the challengers are likely to prevail on the merits when it comes to their petitions targeting the emergency rule. That reality together with the other stay factors show that the emergency rule should remain stayed. *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490.

I.

Congress passed the Occupational Safety and Health Act in 1970. Pub. L. No. 91-596, 84 Stat. 1590. With the Act, Congress created an agency to administer the statute—the Occupational Safety and Health Administration, called OSHA for short—which sits within the Department of Labor. From the outset, the Act was designed to ensure "safe and healthful working conditions" for employees. 29 U.S.C. § 651(b). The Act empowers the Secretary of Labor, through OSHA, to create health and safety regulations for workplaces across the country. *Id.* § 655(b). Before such regulations go into effect, they must withstand a rigorous process. The Secretary must provide notice of any proposed regulation and give 30 days for any affected entity to submit data or offer comment about the costs, benefits, feasibility, legality, or any other reason for rejecting, adopting, or modifying the proposed rule. *Id.* § 655(b)(2). Those who object to the rule may request a public hearing. *Id.* § 655(b)(3). Within 60 days of the end of the period for submitting comments or the completion of a requested hearing, the Secretary must publish a rule or decide not to issue one. *Id.* § 655(b)(4). Still more process is called for if the proposed rule involves, as this one allegedly does, "toxic materials or harmful physical agents," in which case its development must be "based upon research, demonstrations, experiments, and such other information as may be appropriate." *Id.* § 655(b)(5).

An exception exists. The Act allows the Secretary to create an "emergency temporary standard" without undergoing all of these notice-and-comment requirements. *Id.* § 655(c). To allow an "emergency" regulation to go into immediate effect, the Secretary must show (1) that "employees are exposed to grave danger from exposure to substances or agents determined to be

toxic or physically harmful or from new hazards," and (2) that the "emergency standard is necessary to protect employees from such danger." *Id.* § 655(c)(1).

Since 1970, the Secretary of Labor has used these emergency powers infrequently—and never to require a medical procedure. Over more than a half-century, the agency has used this power just nine times before this year. *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 609 (5th Cir. 2021). Six of these standards were challenged in court. *Id.* Just one was allowed to go into effect. *Id.*; *see also* 79 Fed. Reg. 61,384, 61,419 (Oct. 10, 2014) (noting that "OSHA has not successfully adopted an emergency temporary standard for over thirty years"). In a more recent exercise of this power, which a court has not yet addressed, the Secretary issued an emergency regulation in June 2021, which imposed requirements on the healthcare industry to reduce transmission of COVID-19, mainly protective clothing and physical distancing. 86 Fed. Reg. 32,376 (June 21, 2021). The emergency rule did not require workers to get vaccinated or subject themselves to uncompensated weekly tests.

At issue is OSHA's November 5 emergency standard, entitled "COVID-19 Vaccination and Testing; Emergency Temporary Standard." 86 Fed. Reg. 61,402 (Nov. 5, 2021). It applies to employers with 100 or more employees, what comes to roughly 80 million employees nationwide. *Id.* at 61,467. And it contains a narrow exemption for employees who "work[] remotely 100 percent of the time" or who "perform their work exclusively outdoors." *Id.* at 61,419, 61,467.

The emergency rule also applies to the 26 States in the country that administer their own state OSHA Plans, which means that those States must enforce the vaccinate-or-test mandate against any covered public employees and private businesses in their jurisdiction. *Id.* at 61,462. Although Congress did not require state and local governments to adhere to the Act, *see* 29 U.S.C. §§ 652(5), 654(a)(2), it used its spending power to encourage States to accept federal funding—up to 50% of the total cost of each state plan—in return for adopting an OSHA-approved state plan, *id.* § 672(g). Under the Act, state plans must be at least as effective as the federal standards required by the Secretary. *Id.* § 667(b), (c)(2).

Under the emergency rule, the employer must verify "the vaccination status of each employee," "maintain a record of each employee's vaccination status," and "preserve acceptable proof of vaccination." 86 Fed. Reg. at 61,552. For employees who opt not to get vaccinated, the employer must require a test every seven days, one that neither the Federal Government nor the employers must pay for and one that the employees may not take without the supervision of an authorized person. *Id.* at 61,530, 61,532, 61,551, 61,553. Unvaccinated employees who do not comply must be "removed from the workplace." *Id.* at 61,532. Unvaccinated employees must wear masks at work with few exceptions. *Id.* at 61,553. The testing and masking requirements do not apply to vaccinated employees. *Id.* Employers who violate the Act face penalties imposed by OSHA: up to $13,653 for each violation and up to $136,532 for each willful violation. 29 C.F.R. § 1903.15(d).

Several companies, organizations, individuals, and 27 States filed challenges to the emergency rule, raising a variety of claims in the various courts of appeals. On November 12, in one of those cases, the U.S. Court of Appeals for the Fifth Circuit stayed the vaccinate-or-test mandate. *BST Holdings*, 17 F.4th at 619. After our circuit was selected to handle the petitions for review on a consolidated basis, we received two sets of pertinent motions: a motion by the Secretary of Labor to vacate the Fifth Circuit's stay order, *see* 28 U.S.C. § 2112(a)(4), and requests by various parties to grant initial hearing en banc.

II.

A few words are in order about the en banc motions in front of us—requests by roughly 59 parties that the full Court hear this case at the outset. At one level, granting the motion makes considerable sense. This is an extraordinary case, suitable for an extraordinary procedure. Given the unusual setting of these consolidated cases—a statutory delegation of authority over countless appeals to one regional court of appeals, 28 U.S.C. § 2112(a)—there is something to be said for putting all hands on deck, particularly when it comes to handling the stay motion, which could turn out to be the key decision point in all of these petitions for review. If the stay motion is the main event in a case about the legitimacy of a six-month emergency rule that ends on May 5, 2022, little opportunity for traditional en banc review will exist at the back end of the case.

All of this explains why we favor granting the motion. But at another level, it makes little difference that our Court has divided 8-8 on whether to grant the en banc motion. We likely will not be the final decisionmakers in this case, given the prospect of review by the U.S. Supreme Court. And the existence of the en banc motion gives the judges of our Court the option to offer their perspectives on the stay motion, in opinions concurring in the denial of initial hearing en banc or dissenting from it.

### III.

In evaluating a stay motion, we ask four questions: Which side is likely to prevail on the merits? What are the costs to the challengers of allowing the emergency rule to go into effect? What are the costs to the Secretary of Labor and others of barring the emergency rule from going into effect? What does the public interest favor? *Nken*, 556 U.S. at 434. In this instance, as in many others, we focus primarily on the likelihood-of-success inquiry. *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2490.

### IV.

The challengers should prevail for two main reasons. A clear-statement rule applies to this wide-ranging and unprecedented assertion of administrative power, and the Secretary of Labor has failed to show that Congress clearly delegated this authority to him.

### A.

Today's emergency rule is not an everyday exercise of federal power. The Secretary claims authority to require 80 million Americans—in virtually every type of American business there is—to obtain a COVID-19 vaccine or, in the alternative, to undertake a weekly COVID-19 test and wear a mask throughout each workday. Because the Federal Government pays for the vaccine but not the weekly test, it is fair to say that the Secretary is prioritizing the vaccine mandate over the test-and-mask mandate, if not coercing vaccinations. *See* 86 Fed. Reg. at 61,434 (acknowledging that the emergency rule "is designed to strongly encourage vaccination"). Further pressure on employees comes from other features of the rule:

(1) Employers must provide time off for employees to get vaccinated and to recover from any side effects, *id.* at 61,457, while the rule does not require them to do so for employees who must undergo weekly tests, even if that requires considerable travel in rural areas, *see id.* at 61,484; (2) the agency normally requires employers to compensate employees for occupational safety gear and required testing but not in this instance, *compare* 29 C.F.R. § 1910.132(h), *with* 86 Fed. Reg. at 61,407 & n.2; and (3) employers can escape many of the administrative burdens of administering the rule if *they* require their employees to get vaccinated, 86 Fed. Reg. at 61,437. Either way, whether treated as a vaccine mandate or a vaccinate-or-test mandate, the Secretary must answer mandates of his own if he wishes to regulate large swaths of Americans with respect to substantial public policy, medical, and economic matters customarily regulated by the States.

In the first place, the federal courts "expect Congress to speak clearly when authorizing an agency to exercise powers" over large numbers of Americans with respect to contested public policy choices of vast significance. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. Skeptical of mismatches between invocations of power by agencies and the statutes that purport to delegate that power, the federal courts require broad assertions of policymaking authority to be premised on direct and specific congressional delegations of that power. Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (quotation omitted); *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). What Justice Stevens said in 1980 in rejecting the "Benzene rule," designed by OSHA to protect American workers from cancer, applies with equal force to today's rule: "In the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the Secretary the unprecedented power over American industry that would result from the Government's view" of the statute. *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion). Notably, OSHA initially attempted to issue the Benzene Rule as an emergency rule, but it abandoned that approach in favor of notice-and-comment rulemaking after the Fifth Circuit stayed the rule. *Id.* at 623.

A national vaccinate-or-test mandate likewise is unprecedented, whether with respect to OSHA or any other federal agency, presumably because the intrusion on individual liberty is serious and because, in OSHA's case, the required medical procedures do not comfortably map onto workplace-specific protective remedies. *See* Cong. Rsch. Serv., *Mandatory Vaccinations: Precedent and Current Laws* 9 (May 21, 2014); *see also* 86 Fed. Reg. at 61,436. If OSHA "claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," it should not be surprised if courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp.*, 573 U.S. at 324 (quotation omitted). As with the eviction moratorium created by the federal Center for Disease Control and invalidated by the Supreme Court, today's "claim of expansive authority" under this provision "is unprecedented." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489; *see Tiger Lily, LLC v. U.S. Dep't of Hous. & Urb. Dev.*, 5 F.4th 666, 668 (6th Cir. 2021). If federal courts have been skeptical when a medically based agency (the CDC) issues broad mandates with respect to housing, they should be equally skeptical when a workplace agency (OSHA) issues broad mandates with respect to medical procedures.

In the second place, the States, not the Federal Government, are the traditional source of authority over safety, health, and public welfare. In the context of a vast attempt to assume these police powers by the Federal Government, Congress must speak unequivocally. Whether it is seizing authority to regulate "the landlord-tenant relationship," *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489, to regulate private property, *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 140 S. Ct. 1837, 1849–50 (2020), to enact run-of-the-mine criminal laws, *Jones v. United States*, 529 U.S. 848, 858 (2000), to enact out-of-the-ordinary criminal laws, *Bond v. United States*, 572 U.S. 844, 848 (2014), or to regulate the retirement age of state court judges, *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991), Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power," *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489 (quotation omitted).

In applying this federalism clear-statement canon, it's worth remembering that the only Supreme Court cases that permitted a government to impose a vaccination mandate on

individuals arose from the States, not the National Government. *Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Zucht v. King*, 260 U.S. 174 (1922). In upholding a vaccination requirement against a substantive due process challenge, the U.S. Supreme Court reasoned that "[t]he safety and the health of the people of [a state] are, in the first instance, for that [state] to guard and protect" and "are matters that do not ordinarily concern the national government." *Jacobson*, 197 U.S. at 38. It's worth remembering that the power of a federal agency to regulate is the power to preempt—to nullify the sovereign power of the States in the area—which explains why 27 States oppose the emergency rule. And it's worth remembering that, if one casually accepts congressional authority to regulate in this area, that recalibration of power comes with easy-to-overlook risks. It would mean that another administration could destroy the trial-and-error benefits of federalism in a different direction, say by adopting a federal law that banned state and local governments from issuing all kinds of health-protective orders: stay-at-home orders, mask mandates, vaccine mandates, and many other measures besides. The power to give with preemptive national regulation includes the power to take away.

## B.

In passing the Occupational Safety and Health Act, Congress did not clearly give the Secretary authority to require workers to undertake a medical procedure like a vaccine or a medical test, whether under his general authority to regulate "employees" in the workplace or under his specific authority to issue "emergency temporary standards."

## 1.

*The Occupational Safety and Health Act covers only workplace-specific hazards and permits only workplace-specific safety measures*. As a threshold matter, the Act is designed to protect "employees" from dangers that arise directly out of the workplace and addresses only workplace conditions, as the title of the Act suggests (the "Occupational Safety and Health Act") and as the rest of the Act confirms. The language of the Act covers dangers arising out of work, say a chemical used to make a plastic product or the heat generated at a steel foundry, not any risk facing the country and every citizen in it. Any other approach would facilitate a

breathtaking expansion of the Secretary of Labor's power. Whatever the health and safety challenges of today (air pollution, violent crime, obesity, a virulent flu, all manner of communicable diseases) or tomorrow (the impact of using the internet on mental health), the Secretary does not have emergency authority to regulate them all simply because most Americans who face such endemic risks also have jobs and simply because they face those same risks on the clock. By going to work each day, American workers do not transform these other risks into "hazards" or "grave dangers" to which "employees are exposed." The Secretary's authority to regulate workplace safety is simply too "indirect[]" to cover this nearly horizonless assertion of power. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2488.

A comparison between the Secretary's emergency proposal (a vaccinate-or-test mandate) and the kinds of requirements he has previously imposed on various industries during the pandemic (a mask mandate) illustrates the problem. Accept for now that, under some circumstances and in some places, the Secretary could impose a mask mandate. That would be a workplace requirement at least. It is one thing for the Secretary to require masks to minimize dangers to which "employees are exposed" during the workday and at the workplace. It is quite another to make an across-the-board judgment that the employee is "strongly encouraged"— emphasis on strongly—to undertake a medical procedure (a vaccination) that cannot be undone at the end of the workday.

Whether it's the Act as a whole or the narrow exception for emergency rulemaking, they both apply, in the words of the D.C. Circuit, only to dangers arising out of "work or work-related activities," *Oil, Chem. & Atomic Workers Int'l Union v. Am. Cyanamid Co.*, 741 F.2d 444, 449 (D.C. Cir. 1984), not all hazards working people may face in their daily lives. That explains why the D.C. Circuit found another medical procedure—the sterilization of women who otherwise would encounter chemicals at work dangerous to the unborn—to be beyond the Act's scope. *Id.*; *see also Steel Joist Inst. v. Occupational Safety & Health Admin.*, 287 F.3d 1165, 1167 (D.C. Cir. 2002) (noting that "the Act authorizes OSHA to regulate only the employer's conduct at the worksite"). "[F]or coverage under the Act to be properly extended to a particular area," seconds the Eleventh Circuit, "the conditions to be regulated must fairly be considered *working*

conditions, the safety and health hazards to be remedied *occupational*, and the injuries to be avoided *work-related.*"  *Frank Diehl Farms v. Sec'y of Lab.*, 696 F.2d 1325, 1332 (11th Cir. 1983).

Other provisions of the Occupational Safety and Health Act reinforce the message.  The Act, it is true, refers to "hazards," "substances," and "agents," terms that read in isolation might suggest that the Secretary could regulate *any* hazardous substance or agent.  But context illuminates meaning.  Throughout the Act, it speaks to hazards facing employees in work-specific contexts and to occupational risks faced due to work:

- The Act's preamble says it is designed "to assure . . . safe and healthful working conditions," 29 U.S.C. § 651(b), and to avoid "personal injuries and illnesses arising out of work situations," *id.* § 651(a).

- A provision says that the Act applies "to employment performed in a workplace" and "to working conditions of employees."  *Id.*  § 653(a), (b).

- A provision tells the Secretary to make rules "for developing information regarding the causes and prevention of occupational accidents and illnesses," *id.* § 657(c)(1), or "work-related deaths, injuries and illnesses," *id.* § 657(c)(2).

The agency's regulations reflect this understanding too.  In general, OSHA requires employers to compensate employees for protective gear and tests needed for work safety. 29 C.F.R. § 1910.132(h).  An exception exists for costs that are not specific to the workplace, say sunscreen or steel-reinforced boots.  *Id.* § 1910.132(h)(2), (4)(iii).  In this instance, the Secretary's decision not to require employers to pay for employees' weekly COVID-19 tests depletes his claim that this emergency rule arises from a work-focused, as opposed to society-focused, imperative.  *See* 86 Fed. Reg. at 61,437.  The Secretary conceded that, while OSHA usually requires employers to bear such costs "in order to remove barriers to employee participation," the agency has not done so here in order to "strongly encourage" vaccination.  *Id.* at 61,407.

OSHA also requires employers to give their employees and the agency access to "relevant exposure and medical records" to identify, handle, and prevent "occupational disease." 29 C.F.R. § 1910.1020(a).  The agency requires employers to keep records that "monitor[] the

amount of a toxic substance or harmful physical agent to which the employee is or has been exposed." *Id.* § 1910.1020(e)(2)(i)(A)(1). But these exposure risks do not cover "situations where the employer can demonstrate that the toxic substance or harmful physical agent is not used, handled, stored, generated, or present in the workplace in any manner different from typical non-occupational situations." *Id.* § 1910.1020(c)(8). As still another example, the agency has rules about occupational noise exposure, which require employers with affected employees to administer a testing program that determines the employee's hearing loss. *Id.* § 1910.95(g). If the hearing loss is determined not to be "work related," however, the employer does not have to provide assistance. *Id.* § 1910.95(g)(8). With respect to the recordkeeping requirements, moreover, an employer "must consider an injury or illness to be work-related if an event or exposure in the work environment either caused or contributed to the resulting condition or significantly aggravated a pre-existing injury or illness." *Id.* § 1904.5(a). In OSHA's rules concerning air contaminants, the rules center on the amount of an employee's exposure to a substance "during an 8-hour shift." *Id.* § 1910.1000(a)–(c).

The agency in the past has understood its authority in this work-anchored way. An examination of the nine "emergency temporary standards" promulgated before 2021, even the five of six that were successfully challenged, reveals only regulations addressing exposures solely because of, not in spite of or in addition to, the workplace. *See* 36 Fed. Reg. 23,207 (Dec. 7, 1971) (workplace protection from asbestos); 38 Fed. Reg. 17,214 (June 29, 1973) (workplace protection from pesticides); 38 Fed. Reg. 10,929 (May 3, 1973) (workplace protection from carcinogenic substances in "area[s] to which access is restricted and controlled by the employer"); 39 Fed. Reg. 12,342 (Apr. 5, 1974) (workplace protection from vinyl chloride); 41 Fed. Reg. 24,272 (June 15, 1976) (workplace protections for diving operations, while noting that "diving by persons engaged in recreational or sport diving or other diving not in an employment context are beyond the jurisdiction of the Act"); 42 Fed. Reg. 22,516 (May 3, 1977) (workplace protections from benzene); 42 Fed. Reg. 45,536 (Sept. 9, 1977) (workplace protection from manufacturing pesticides); 43 Fed. Reg. 2586 (Jan. 17, 1978) (workplace protection from acrylonitrile); 48 Fed. Reg. 51,086 (Nov. 4, 1983) (workplace protection from asbestos).

All in all, the Secretary might have authority to impose mandates of some sort on doctors and nurses who treat COVID-19 patients or researchers who work with the underlying virus given the workplace "exposure" risks caused by that work. And it might give the Secretary authority to impose workday masking requirements in other settings vulnerable to COVID-19 exposures. But the emergency rule extends well beyond such workplace-specific hazards and workplace-specific remedies.

2.

Not only is it doubtful that Congress gave the Secretary of Labor clear authority to impose this vaccinate-or-test mandate through the general provisions of the Act, but Congress also failed to do so clearly under the provision for "emergency temporary standards." In relevant part, the provision for emergency rules says:

> The Secretary shall provide, without regard to the requirements of chapter 5 of Title 5, for an emergency temporary standard to take immediate effect upon publication in the Federal Register if he determines (A) that employees are exposed to grave danger from exposure to substances or agents determined to be toxic or physically harmful or from new hazards, and (B) that such emergency standard is necessary to protect employees from such danger.

29 U.S.C. § 655(c)(1).

*The statute applies only to "necessary" provisions that address "grave" workplace dangers.* The term "necessary" has one of two meanings, either "useful" or "indispensable"/"essential." *Black's Law Dictionary* 928 (5th ed. 1979); *American Heritage Dictionary of the English Language* 877 (1975). Picking between the options might be difficult if the word appeared alone. But it does not. It appears in the context of a provision dealing with an "emergency" and "grave" danger. Understanding words, like filling in crossword puzzles, works best by attending to context—what is nearby, what is known. *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000). Once connected, the reference to "necessary" powers to address "grave" dangers in an "emergency" clarifies that "necessary" has the narrower meaning. It refers only to indispensable or essential measures, not to whatever the Secretary determines is useful or beneficial.

A comparison to the Secretary's authority to impose permanent standards confirms this reading. When he puts a rule through notice and comment, the standard need not be "necessary to protect employees," 29 U.S.C. § 655(c)(1), only "reasonably necessary or appropriate to provide safe or healthful employment," *id.* § 652(8); *see id.* § 655(b). An emergency measure thus must be more than just appropriate; it must be indispensable or essential.

Turn to "grave" dangers, which refer to "serious" workplace dangers. *Webster's Ninth New Collegiate Dictionary* 534 (1984). Taken by itself, there is room for debate about the meaning of a serious workplace danger, particularly one that the statute allows the Secretary to "determine[]" himself. But the record in this case and the Secretary's position in describing his rulemaking narrow the range of debate. Whatever a grave or serious workplace danger might mean in the abstract, the Secretary concedes that vaccinated individuals who get the virus do not face that risk, even though they can contract it while going to work with unvaccinated individuals. 86 Fed. Reg. at 61,434. Else, the Secretary would require vaccinated Americans to work at home or stay home altogether.

This interpretation of the statute and the Secretary's concession make it exceedingly difficult to maintain under any standard of review that the emergency mandate is necessary or indispensable to address a grave danger. One problem arises from a core tenet of administrative law. The Secretary never considered this meaning of the statute—that it requires indispensable or essential measures, not simply useful or beneficial ones—in proposing the emergency rule. It is a staple of administrative law that federal courts may not uphold a rule on a ground never addressed by the agency. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). The Secretary to date has explained only why he thinks the vaccinate-or-test mandate is beneficial to protect workers and society as a whole. He has not explained why it is the indispensable or essential way to protect workers. We have no authority to uphold a rule as "necessary" when the Secretary has not made that finding himself under the correct interpretation of the law. *See* 5 U.S.C. § 706(2).

The other problem is that the Secretary cannot satisfy this interpretation of the statute. Consider the many less intrusive, more tailored protective measures that address grave dangers on the Secretary's own terms. Just as the Secretary targeted the healthcare industry in June 2021

with mask and other protective-gear requirements, he could do the same for industries that face high spreading risks. The record does not show that full vaccination or weekly testing is necessary on top of a tailored mask mandate. The Secretary could focus any requirements on the workers most at risk—those over 65, those with pre-existing conditions most vulnerable to the virus, those who have not already gotten the virus. The Secretary could create exemptions for those least at risk, say cohorts from age 18 to 49, a population range that faces healthcare risks from COVID-19 at roughly the same level as the Secretary's own assessment of what is not a grave risk, with some slightly above and some slightly below. *See* 86 Fed. Reg. at 61,434; Ctr. for Disease Control, Rates of COVID-19 Cases and Deaths by Vaccination Status, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. Or the Secretary could impose requirements that account for the many environments in which Americans work. Consider the range of possibilities—from the two-person janitorial staff working the night shift, to the consultant who comes into the office a few times a week, to the company that already requires masks (but not weekly tests) and requires significant separation of workers protected by up-to-date ventilation systems, to the firm that rotates workers between telework and in-person to minimize contact. But that is not what the rule does. "Applying to 2 out of 3 private-sector employees in America, in workplaces as diverse as the country itself, the Mandate fails to consider what is perhaps the most salient fact of all: the ongoing threat of COVID-19 is more dangerous to *some* employees than to *other* employees." *BST Holdings*, 17 F.4th at 615.

In the face of the many less intrusive options available to the Secretary, the idea that a national vaccinate-or-test mandate for 80 million workers is necessary is hard to maintain. And that is true under any standard of review: fresh review of the language of the statute, substantial evidence review, arbitrary or capricious review, or the "harder look" review due emergency rules. *Asbestos Info. Ass'n v. Occupational Safety & Health Admin.*, 727 F.2d 415, 421 (5th Cir. 1984).

*The statute covers only an "emergency" and only "temporary" requirements*. In construing statutes, courts frequently look to the context in which they arise—here authority to set "emergency temporary standards" that sidestep the notice-and-comment process. *See, e.g.*,

*Bond*, 572 U.S. at 861–63; *Johnson v. United States*, 559 U.S. 133, 139–40 (2010).  Whether one looks to the Secretary's strongly encouraged preference (vaccinate) or discouraged alternative (test and wear a mask), it is difficult to understand how on November 5, 2021, an "emergency" suddenly took hold requiring the imposition of a vaccinate-or-test mandate by January 4, 2022.  Start with the mask requirement.  As the Secretary well knows, masks are not a new idea.  They have been a protective tool from the outset.  Given the wide availability of this option since the beginning, the view that this requirement counts as an "emergency" measure, all at a time when fewer people face lethal risks from COVID-19, sucks the concept dry of meaning.

Vaccines are newer, to be sure.  But they hardly are a revelation.  They have been readily available since last spring, and they alleviate the health risks from the pandemic rather than make them worse.  Why now?  Why above all immediately impose such a controversial mandate on 80 million workers without undergoing the give and take that comes with the notice-and-comment process—and that usually leads to better rulemaking and always leads to more transparency about the costs and benefits of any new rule for workers and companies.  *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1816 (2019).  The "more expansive" a rule's reach, "the greater the necessity for public comment."  *Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

How, moreover, is a vaccine "temporary"?  That approach conveys considerable insensitivity to those who, for reasons of their own, are reluctant to roll up their sleeves.  By any measure, a vaccine injection is not temporary.

Making the invocation of this emergency temporary power odder still is the nature of the risks presented by COVID-19 today.  It is not working men and women in the main who face the most serious risks.  It is older men and women, most of whom are retired and who no longer are subject to the Secretary's oversight.  The key risks to individuals who do work and who remain unvaccinated are to them, not to their vaccinated colleagues.  Sure, there have been, and likely will continue to be, breakthrough cases that infect vaccinated individuals, some no doubt facilitated by unvaccinated individuals.  But the Secretary agrees that this risk is not serious.  During the rulemaking process, he acknowledged that the risk to vaccinated employees of

continuing to work with unvaccinated employees is "not" a "grave danger."  86 Fed. Reg. at 61,434.

That leaves the Secretary with the burden of answering this question:  Is it really an emergency to protect retired individuals from a workplace they no longer visit, to protect vaccinated working people from a risk the Secretary does not consider grave, and to protect unvaccinated working people from themselves based on highly personal medical decisions?  That is a heavy lift, one that is highly unlikely to withstand any standard of review.

Equally unavailing is the Secretary's other explanation for the emergency rule.  Education, public-health advocacy, and easy-to-obtain free vaccinations, he points out, have not worked as well as or as quickly as the Federal Government hoped—because just 70% or so of Americans have received one shot and just 60% or so of Americans are fully vaccinated.  Ctr. for Disease Control, COVID-19 Vaccinations in the United States, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total; *see* 86 Fed. Reg. at 61,431–32.  The Secretary projects that the "strongly encourage[d]" vaccination option would lead an additional 22.7 million workers to get vaccinated, increasing the vaccination rate in the covered workforce from 62% to 89%.  86 Fed. Reg. at 61,433, 61,472.  These estimates as an initial matter lift the veil on the Secretary's understanding of the rule, revealing that he thinks it will operate much more like a vaccine mandate than a vaccine option.  Another problem lurks as well.  In the context of new viruses, new variants, and other challenges presented by communicable diseases, there will always be a spectrum of medical developments and innovations, whether it is new types of vaccinations, booster shots, medical treatments, or something else.  That ongoing reality does not give one national agency the option of labeling something an "emergency" in perpetuity, immediately imposing a one-size-fits-all-companies solution on the country, preempting all contrary approaches to the matter in our States and cities, and circumventing the notice-and-comment process.  "In case of emergency break glass" this is not—unless we wish to sideline the notice-and-comment process and the trial-and-error benefits of American federalism with respect to every future medical innovation concerning COVID-19 for this federal agency and other ones too.

One last point on this score. The statute gives the Secretary authority to issue an emergency rule only for six months. 29 U.S.C. § 655(c)(2)–(3). It does not mention any authority to extend the rule for another six months. To our knowledge, the Secretary has never used this narrow authority to extend an emergency rule for another six months. All of this prompts a question: Does the Secretary expect to finish the notice-and-comment process with respect to this uniquely important and uniquely wide-ranging rule by May 5, 2022, when the emergency rule dissolves? That seems improbable. As our circuit has come to appreciate, this rule affects a lot of industries and a lot of people. Consistent with that reality, the Secretary has already granted one 45-day extension of time, extending the end of the public comment period from December 6, 2021, to mid-January 2022. The six-month nature of the Secretary's emergency-rule authority highlights the unusual nature of its exercise today.

In view of this conclusion, we need not address several serious constitutional claims raised by the challengers. Among others, there are at least these three that would need to be addressed before the emergency rule could be enforced. One, does this regulation of non-commercial inactivity—a requirement that the unvaccinated get shots or weekly tests—exceed Congress's Commerce Clause power? *See Nat'l Fed. of Ind. Bus. v. Sebelius*, 567 U.S. 519, 550–52 (2012); *infra* at 33 (Bush, J., dissenting); *BST Holdings*, 17 F.4th at 619 (Duncan, J., concurring). Two, if we accepted the Secretary's sweeping reading of the Act—permitting him to regulate any substance, whether unique to work or not, so long as the Secretary finds it dangerous—would that amount to an unconstitutional delegation of power? *See Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019); *id.* at 2135–37 (Gorsuch, J., dissenting). *Compare Indus. Union Dep't*, 448 U.S. at 645 (plurality opinion) (avoiding this constitutional question by construing the statute to narrow OSHA's authority), *with id.* at 687 (Rehnquist, J., concurring in the judgment) (finding an unconstitutional delegation because "[i]t is difficult to imagine a more obvious example of Congress simply avoiding a choice which was both fundamental for purposes of the statute and yet politically so divisive that the necessary decision or compromise was difficult, if not impossible"). Three, does compelling faith-sensitive employers to administer these mandates violate the Free Exercise Clause or the Religious Freedom Restoration Act by interfering with their employment decisions or religious mission? *See Burwell v. Hobby*

*Lobby Stores, Inc.*, 573 U.S. 682, 719–20 (2014); *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060–61 (2020). Because our interpretation of the relevant statutes avoids these constitutional claims and any others, we need not address them. *See United States v. Erpenbeck*, 682 F.3d 472, 476 (6th Cir. 2012). By contrast, anyone who takes the view that the Fifth Circuit's stay should be lifted must come to grips with each of the statutory imperatives, each of the clear statement requirements, and all of the constitutional claims.

C.

The Secretary insists that any ambiguity in the statute favors him, not the challengers. He claims that uncertainty about the meaning of the statute allows him to construe the statute to exercise more power, not less. Resp. Mot. to Dissolve Stay at 17; *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843–44 (1984). But ambiguity for *Chevron* purposes comes at the end of the interpretation process, not at the beginning. *Id.* at 843 n.9. The clear-statement canons eliminate any power-enhancing uncertainty in the meaning of the statute. With "significant constitutional and federalism questions raised" and a federalism-protecting interpretation of the statute not clearly ruled out, we must accept that interpretation and "reject the request for administrative deference." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001).

A contrary approach leads to a characterization of administrative law under which significant decisions of the U.S. Supreme Court were one emergency regulation, no notice, no comment, away from oblivion, indeed from effectively being overruled. If the Secretary is right, the federal office of civil rights suddenly could have construed the ambiguity in the ADEA to cover state court judges. *Cf. Gregory*, 501 U.S. at 460–61. If true, the Department of the Interior suddenly could have construed the ambiguity in the Mineral Leasing Act and National Trails System Act to regulate all manner of private property. *Cf. Cowpasture River Pres. Ass'n*, 140 S. Ct. at 1848–50. If true, the SEC suddenly could have construed the Securities and Exchange Act to apply outside the United States. *Cf. Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 272–73 (2010). And so on. *Chevron* has no role to play in this case.

The Secretary counters that he is entitled to issue an emergency rule given new knowledge about the dangers of COVID-19 and the increased risk of infection and transmission due to the Delta variant. But the Delta variant has dominated our country's COVID-19 statistics since June. *See* 86 Fed. Reg. at 61,408–09. Even then, the Secretary found that vaccinated workers do not face a "grave danger" from COVID-19, with or without the existence of Delta. *Id.* at 61,434.

The Secretary emphasizes that he *is* regulating the workplace because the virus creates risks for working men and women. But authority to regulate the workplace with protective gear designed to handle on-the-job exposures to substances and tailored to the circumstances of that job is one thing; authority to require medical procedures or tests for two-thirds of American workers, no matter their work circumstances or individual risks, is quite another. This is precisely the kind of broad assertion of administrative power that should be accompanied by clear, direct, and channeled delegations by Congress. It is hard to think of a better example of the need for a clear statement of congressional authority than this one.

The Secretary and some of his supporters claim that regulating infectious diseases through vaccines is not as unusual as the challengers maintain, pointing to a bloodborne pathogen regulation from 1991. *See* 29 C.F.R. § 1910.1030. But that regulation shows what works and what does not. The 1991 regulation required employers to make the hepatitis B vaccine "available" to employees "who have occupational exposure" to bloodborne pathogens at no cost to the employee and at a reasonable time and place. *Id.* § 1910.1030(f)(1)(i)–(ii). Consider all of the differences between that regulation and this one. It narrowly targeted "health care workers" for protection "from viruses, particularly those causing Hepatitis B and AIDS, that can be transmitted in the blood of patients." *Am. Dental Ass'n v. Martin*, 984 F.2d 823, 824 (7th Cir. 1993). It did not regulate all American businesses, no matter the nature of the industry, product, or service, so long as 100 employees or more work there. It was "[p]romulgated after a protracted notice-and-comment rulemaking proceeding." *Id.* It did not sidestep that process. And it appreciated the personal nature of the decision whether to get a vaccine—that a truly voluntary program, in OSHA's words, would "foster greater employee cooperation and trust in

the system." 56 Fed. Reg. 64,004, 64,155 (Dec. 6, 1991). It did not pressure or coerce unvaccinated employees by imposing significant costs and burdens on them alone. Instead of helping the Secretary's cause, a comparison between the 1991 rule and the 2021 rule undermines it.

The Secretary relatedly points to a different part of the statute to suggest that Congress contemplated immunization when delegating its authority. In a section on "Research and Related Activities," Congress gives the Secretary of Health and Human Services authority to establish programs to examine and test the workplace to "determin[e] the incidence of occupational illnesses." 29 U.S.C. § 669(a)(5). The authorization comes with this caveat: "Nothing in this or any other provision of this chapter shall be deemed to authorize or require medical examination, immunization, or treatment for those who object thereto on religious grounds, except where such is necessary for the protection of the health or safety of others." *Id.* This argument tries to squeeze a lot of power out of a very small statutory tube. It involves a single reference to immunizations, a reference that explains when they are prohibited. It comes from a different part of the statute and concerns the Secretary of Health and Human Services, not OSHA and not the Secretary of Labor. If this is a "clear statement" of congressional authority that OSHA may impose a vaccinate-or-test mandate on the American workforce, we should call it a "nearly silent" rule, not a "clear statement" rule.

What of the Secretary's claim that he should not be second-guessed for applying the emergency rule just to companies with 100 employees or more? The problem is not second-guessing; it is matching the Secretary's explanations for this emergency rule with its scope. If the explanation for announcing an emergency rule is the "grave dangers" that American workers face on the job from getting the virus, that risk applies to all companies in which employees work together inside. Nor does it answer the point to say, as the Secretary does, that he was concerned about imposing administrative burdens on smaller companies. Think of how that argument would fare in another context. If the Secretary suddenly realized that exposure to a new chemical created a "grave" danger of cancer, it is difficult to imagine that anyone would

permit an emergency rule targeting the problem to apply only to companies with over 100 employees in order to save the other companies money.

What of a related reality—that federal agencies historically have been able to impose drug tests on workers? But, again, those regulations illustrate the permitted and forbidden sides of the line. The Department of Transportation, to be sure, may require employees in a few industries—airlines, railroads, motor carriers, public transit—to take periodic drug tests given the flat-line risks to the public of having impaired pilots, conductors, truckers, or bus drivers. *See, e.g.*, 49 U.S.C. §§ 45102(a)(1), 20140(b)(1)(A), 31306(b)(1)(A), 5331(b)(1)(A). But that authority, specific to a few industries and clearly delegated by Congress, would not give the Department of Transportation power to require American workers to take a drug test to end the opioid crisis—even if such tests could save up to 100,000 lives a year.

This last question and answer largely take care of the next objection—that the emergency rule is needed to deal with certain types of private employers that have been devastated by virus break-outs. A good example, as the Secretary and many others point out, is the meatpacking industry, where many of the largest spreading events initially occurred. Two responses. As with the special risks facing the transportation industry, Congress and OSHA may wish to focus on special risks facing healthcare workers and the workers in other high-risk industries. But that is not what this rule does. The other response is to note that the industries most at risk happen to be the ones most proactive in addressing the risks of the pandemic. How could an emergency rule be necessary to protect meatpacking workers when, so far as the record shows, that industry has obtained high vaccination rates on its own? *See, e.g.*, Am. Pub. Health Ass'n et al. Amicus Br. at 16 (noting that more than 96% of Tyson Food's 120,000 U.S. workers are vaccinated); 86 Fed. Reg. at 61,435. Just as the Secretary must match his assertion of power with the statute, he must match his exercise of power with explanations in the record that fit the bill.

What of the collective-action problem at the root of this assertion of power? Doesn't the agency have authority to deal with the external costs created by vaccination decisions—the cost to others created by individuals who choose not to get vaccinated and the cost to society of slowing down efforts to bring the virus to heel? *See* 86 Fed. Reg. at 61,539 (explaining that

vaccination reduces the risks that workers "present to others given the reduced likelihood of transmission"); *id.* at 61,520 (noting that "[c]urrent efforts to increase the proportion of the U.S. population that is fully vaccinated against COVID-19 are critical to ending the COVID-19 pandemic"). But, as shown, the risk to vaccinated workers from unvaccinated workers is one that the Secretary agrees is not a grave danger. No less significantly, it's doubtful this federal power sweeps this broadly given the vertical separation of powers embedded in our Constitution. There is a Commerce Clause, yes. It gives Congress broad powers, to be sure. And it helps the Federal Government to resolve some collective-action problems affecting interstate commerce, no doubt. But through it all, it remains a Commerce Clause, not a collective-action clause—and not a clause that grants the national government all of the police powers customarily associated with state governments in order to fix any new societal challenge.

That the Constitution permits the Federal Government to resolve some collective-action problems facing society but not all of them simply confirms that "there are two sides to today's story." *Tiger Lily*, 5 F.4th at 675 (Thapar, J., concurring). On one side, yes, the Federal Government has considerable authority to regulate and sometimes mandate what individuals may do. But the other side reveals many libertarian guarantees of the U.S. Constitution, each empowering individuals to resist national solutions to pedestrian and urgent policy problems alike. Before we rush to lament the reality that American individualism may present obstacles to quelling the pandemic as quickly as we would like, it's worth keeping in mind that it is a national trait that has done the country some good from time to time. Perhaps indeed Americans' non-conformist ways have had something to do with American businesses bringing vaccines to market more quickly than any vaccine in history and doing so more quickly than any other country, collectivist or not, has been able to do. *See* Drew Armstrong, *The World's Most Loathed Industry Gave Us a Vaccine in Record Time*, Bloomberg Businessweek (Dec. 23, 2020), https://www.bloomberg.com/news/features/2020-12-23/covid-vaccine-how-big-pharma-saved-the-world-in-2020; Jared S. Hopkins, *How Pfizer Delivered a Covid Vaccine in Record Time: Crazy Deadlines, a Pushy CEO*, Wall St. J. (Dec. 11, 2020), https://www.wsj.com/articles/how-pfizer-delivered-a-covid-vaccine-in-record-time-crazy-deadlines-a-pushy-ceo-11607740483.

What of the concern that the federal courts should take a low-impact approach to the public policy exigencies created by a crisis like the pandemic? It is a fair question. But it submits to fair answers. One is that, in the absence of a notice-and-comment process, the federal courts are all that's left. Who else, what else, is there to assess unfounded assertions of emergency powers by a federal agency that will have irreversible consequences for American workers and companies? The other answer is that overlooking rule-of-law limitations on federal power usually increases—it does not ameliorate—the footprint of the federal courts. It is the rare accretion of power to the President, Congress, or a federal agency that does not eventually take the federal courts along for the ride.

V.

The other stay factors largely favor the challengers as well. Because OSHA's authority extends only to regulating the workplace, the equities embedded in the stay factors do not extend to the costs to society of having unvaccinated Americans. They extend only to the risks to workers and companies.

From the perspective of the challengers, there are serious irreversible costs if the emergency rule is immediately allowed to go into effect. Start with employees. The vaccinate-or-test mandate has costs for them that cannot be undone. Whether it is an irreversible vaccination, uncompensated testing costs, or a lost job, the affected employees face considerable jeopardy if the federal courts mistakenly allow this rule to go into effect. The same is true of employers, whether one focuses on the estimated $3 billion in compliance costs or the difficulties small companies (with just over 100 workers) will face in competing with smaller companies who can attract workers disinterested in complying with the mandate. From the perspective of the Secretary of Labor and other parties that support the emergency rule, the main risk of staying the rule is to unvaccinated American workers. But as we near the two-year anniversary of the pandemic, it is hard to see why American workers are not allowed to assess the risk-benefit choice of this personal medical decision for themselves. Even if the mandate would have ancillary benefits for Americans who come into contact with unvaccinated workers outside the workday, that consideration is not OSHA's to regulate. From the perspective of the

public interest, it is both wise and beneficial to stick with historical norms—that the default rule in agency rulemaking should be the notice-and-comment process, particularly when a rule imposes highly consequential new regulations on American workers and companies and when the agency has never invoked such a power before. A "lack of historical precedent" tends to be the most "telling indication" that no authority exists. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (quotation omitted).

All of this undermines the Secretary's view that we should lift the stay issued by the Fifth Circuit. But it leaves unmentioned one other part of the stay calculation—that the Secretary estimated during the rulemaking process that the emergency rule would save 6,500 lives—a point unmentioned until now because it is never easy for judges to deal with. In one sense, it is far better to have the President, Congress, an authorized federal agency, or the States making cost-benefit decisions when American lives are at stake. Who are we to say when an emergency rule should go into effect if the rule would save lives? The only thing that prevents such a job from being unbearable is to appreciate that not every such decision is for us to make.

In this instance, the first answer is that the Secretary has assumed a power he does not have. Even though the CDC's eviction moratorium was defended on the same ground—that it would save thousands of lives—the Supreme Court refused to allow the agency to enforce it. *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490. So also when States defended stay-at-home orders that restricted religious services on the ground that they would save lives. These orders, too, were stayed. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69 (2020) (per curiam). The second answer is that, once judges go beyond the modest task of determining whether statutes permit agency action, these broader considerations become exceedingly complicated—and well beyond our ken. Even the Secretary's own actions illustrate this complexity, especially if saving lives is the only consideration. Look back on the many times when a vaccinate-or-test mandate was not pressed by the Secretary: not in June 2021, when he issued the protective-gear orders with respect to the healthcare industry; not in September 2021, when he initiated this rulemaking procedure; and not on November 5, 2021, when he announced this six-month rule and said it would not go into effect until January 4, 2022. Consider too the many Americans still

unprotected by this emergency rule: workers in companies with fewer than 100 employees and all customers who visit any American retail store or business. But it would be no more fair to criticize the Secretary of Labor on this ground than it would be to register a similar criticism against the Fifth Circuit for staying the emergency rule. That takes us back to where we started: The Secretary's emergency rule likely exceeds his authority.

The Court should grant the petition for initial hearing en banc and leave the Fifth Circuit's stay of the emergency rule in place.

---

## DISSENTING FROM THE DENIAL OF INITIAL HEARING EN BANC

---

BUSH, Circuit Judge, dissenting from the denial of initial hearing en banc.  This is a case about the Occupational Safety and Health Administration, but it is really a case about power. Specifically, it concerns the attempted exercise of a purported power—to impose a *de facto* national vaccine mandate[1] upon some eighty-million Americans—that OSHA was never given and that Congress likely could never have given to it.  Chief Judge Sutton's dissent ably explains the former defect, and so I join it in full.  I write separately to address the latter.

Whether it uses a clear statement or not, Congress likely has no authority under the Commerce Clause to impose, much less to delegate the imposition of, a *de facto* national vaccine mandate upon the American public.  Such claimed authority runs contrary to the text and structure of the Constitution and historical practice.  The regulation of health and safety through compulsory vaccination is a traditional prerogative of the states—not the domain of Congress and certainly not fodder for the diktat of a federal administrative agency.  Because we should have granted initial hearing en banc to vindicate the correct understanding of the Constitution and to cabin OSHA to its legitimate role, I respectfully dissent.

### I.

This case has a veneer of complexity, so it is useful to start with some first principles of constitutional adjudication.  It may seem paradoxical that some of the most effusive guarantees of liberty can be found in the bills of rights of some of the world's most savage dictatorships. *See* Antonin Scalia, *Foreword: The Importance of Structure in Constitutional Interpretation*, 83 N.D. L. Rev. 1417, 1418 (2008).  Why do *we* seem to respect our bill of rights, at least in the main, while other attempts have faltered the world over?  The answer is structure. *Id.*  Our Framers understood that the true bulwark of liberty is not a "parchment guarantee[ ]," but the diffusion of power both horizontally and vertically. *Id.* (quoting The Federalist No. 51, at 323

---

[1]For a discussion of why I apply this label to OSHA's standard, *see infra* pages 35–36.

(James Madison) (Clinton Rossiter ed., 1961)); *see also United States v. Morrison*, 529 U.S. 598, 616 n.7 (2000) ("[T]he Framers crafted the federal system of Government so that the people's rights would be secured by the division of power.").

James Madison called our constitutional structure a "double security" for "the rights of the people." The Federalist No. 51, *supra*, at 320 (James Madison). Power was first divided by the Constitution "between two distinct governments"—federal and state. *Id.* And that power was then "subdivided among distinct and separate departments"—legislative, executive, and judicial. *Id.* Thus, just as each government was "controlled by itself," the federal and state governments "would control each other." *Id.* The "extensive portion of active sovereignty" the Constitution left to the states would prevent our institutions from degenerating "into one consolidated government" and would thereby check the resulting infringement on the people's liberty. The Federalist No. 45, *supra*, at 286–87 (James Madison); *see also New York v. United States*, 505 U.S. 144, 181 (1992) ("State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." (cleaned up)).

The constitutional text bears out that original design. Congress inherited from the Constitutional Convention no roving warrant to legislate on whatever matter it sees fit. Indeed, the Framers directly rejected such sweeping authority. *See* 2 The Records of the Federal Convention of 1787, at 21–27 (Max Farrand, ed. 1911). That was not because the idea lacked a proponent—Gouverneur Morris took "the controversial position that the federal government should possess the police power." William Michael Treanor, *The Case of the Dishonest Scrivener: Gouverneur Morris and the Creation of the Federalist Constitution*, 120 Mich. L. Rev. 1, 28 (2021). But he was alone in that view. "No one else at the . . . Convention argued that the national government should have the 'police' power." *Id.* at 29. Rather, Morris's fellow delegates spoke of it only "as a power of the states." *Id.* And so our limited Constitution emerged, carefully enumerating and thus carefully cabining each federal branch's respective powers. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) ("The enumeration

of powers is also a limitation of powers[.]"). As a result, when Congress wishes to legislate, it must show "that a constitutional grant of power authorizes each of its actions." *Id.* at 535.

But "[t]he same does not apply to the States, because the Constitution is not the source of their power." *Id.* States instead enjoy a residual authority to regulate within their borders—a power that pre-dates the Constitution and does not derive from it. *Id.* at 535–36. The Tenth Amendment memorializes that point, clarifying that those "powers *not* delegated to the United States by the Constitution" are "reserved to the States respectively, or to the people." U.S. Const. amend. X (emphasis added); *see also* Joseph Story, *Commentaries on the Constitution of the United States* 711–12 (Ronald D. Rotunda & John E. Nowak, eds. 1987). The states under our federated system thus enjoy a "general power of governing"—what the Supreme Court has repeatedly termed their "police power." *Nat'l Fed. of Indep. Bus.*, 567 U.S. at 536.

Part and parcel of that traditional police power—and thus an authority "reserved to the States"—is the power to regulate public health. U.S. Const. amend. X; *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905). Indeed, the Court has called it a "settled principle[ ]" that states enjoy a police power to promulgate "legislative enactment[s to] protect the public health and the public safety." *Jacobson*, 197 U.S. at 25; *see also Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 592 (1906) (holding that "the police power of a State embraces . . . regulations designed to promote the public health"); *Berman v. Parker*, 348 U.S. 26, 32 (1954) (describing regulation of "public health" as a "traditional application of the police power"). And in the specific context of compulsory vaccination, the Court has twice confirmed that the propriety of such mandates is a matter vested to the police power of the states. *See Jacobson*, 197 U.S. at 24–25; *Zucht v. King*, 260 U.S. 174, 176 (1922) (describing it as "within the police power of a State to provide for compulsory vaccination").

Those holdings notwithstanding, OSHA invokes the Commerce Clause to suggest that it is really the *federal* government, not the states, that enjoys the authority to mandate vaccination for employees nationwide. Before I explore the constitutional validity of that position, let me first explain why I label the standard a *de facto* national vaccine mandate for eighty-million Americans. OSHA has not minced words about the purpose and effect of its standard; according

to OSHA itself, "[c]overed employers *must* develop, implement, and enforce a *mandatory* COVID-19 vaccination policy" for their employees. 86 Fed. Reg. 61,402 (Nov. 5, 2021) (emphases added). Thus, some half of our workforce must either become vaccinated or both (1) "wear a face covering at work in lieu of vaccination" and (2) submit to weekly testing for COVID-19. *Id.* Neither OSHA nor the employer is required to bear the expense. *Id.* at 61,532. Rather, it falls on the unvaccinated employee to shoulder the costs of compliance. *Id.* And if states do not adopt OSHA's standard or some other plan that is "at least as effective," they face penalties like the revocation of approval of their State Plans and the associated loss of millions in federal funding. *See* "Emergency Temporary Standard," Occupational Safety and Health Administration, https://www.osha.gov/coronavirus/ets2/faqs (last visited Dec. 14, 2021) (explaining that if a State Plan is not "at least as effective" as OSHA's emergency rule, consequences include "OSHA's reconsideration and possible revocation of the State Plan's final approval status"); *see also* "What is an OSHA-Approved State Plan?", *id.*, https://www.osha.gov/stateplans/faqs (last visited Dec. 14, 2021) ("OSHA approves and monitors all State Plans and provides as much as 50 percent of the funding for each program.").

So again, what constitutional warrant does OSHA possess for this scheme? The agency appeals to commerce. But the Commerce Clause likely cannot be read to grant such an authority, because it cannot be read to confer a general police power upon the national government. True, the Court has at times read the Clause broadly, stretching its meaning to the edge of plausibility. *See, e.g.*, *Wickard v. Filburn*, 317 U.S. 111 (1942). Yet the Court has *never* crossed the Rubicon of declaring a federal police power. Time after time, it has rejected the notion that such a power exists. *See United States v. Lopez*, 514 U.S. 549, 566 (1995) (explaining that the Constitution "withhold[s] from Congress a plenary police power"); *id.* at 584 (Thomas, J., concurring) ("[W]e *always* have rejected readings of the Commerce Clause and the scope of federal power that would permit Congress to exercise a police power[.]"); *Nat'l Fed. of Indep. Bus.*, 567 U.S. at 536 ("Our cases refer to this general power of governing, possessed by the States but not by the Federal Government, as the 'police power.'"). So the Commerce Clause, which generated "no apprehensions" upon its addition to the Constitution, cannot be read to effect a late-breaking revolution in state-federal affairs by granting a federal agency the right

to regulate a core area of traditional state concern. The Federalist No. 45, *supra*, at 290 (James Madison).

What first principles dictate, fresh precedent confirms. The Supreme Court in recent years has squarely rejected a view of the commerce power under which "individuals may be regulated . . . whenever enough of them are not doing something the Government would have them do." *Nat'l Fed. of Indep. Bus.*, 567 U.S. at 553 (opinion of Roberts, C.J.); *accord id.* at 649–60 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). The case I mention involved an individual mandate to coerce those without health insurance to purchase it. *Id.* Congress claimed the power to regulate the failure to engage in a commercial activity—the buying of insurance—because uninsured persons' failure to do so had a substantial aggregate effect on interstate commerce. *Id.* at 554. Here, by contrast, OSHA claims the power to regulate the failure to engage in a *non-commercial* activity—the taking of a vaccine—because unvaccinated persons' failure to do so may affect interstate commerce. OSHA's theory of the commerce power is thus even more extravagant than what the Supreme Court has already rejected. If Congress cannot solve a perceived commercial problem with a "mandatory purchase," then how can it possess the authority, much less delegate it, to solve a perceived commercial problem by mandating that Americans engage in a *non-commercial* activity?[2] *Id.* at 553. The answer, of course, is that it likely cannot.

Before I turn to history, let me close with a final word on precedent, lest I be misunderstood. Here, I do not question the constitutionality of OSHA itself, or of federal workplace-safety regulations more broadly. *But see* Cass R. Sunstein, *Is OSHA Unconstitutional?*, 94 Va. L. Rev. 1407 (2008) (questioning OSHA's constitutionality on non-delegation grounds). For even accepting that Congress (and thus, perhaps, OSHA) has the power to regulate a *workplace* hazard that affects interstate commerce, that is not what OSHA has done. OSHA has instead pretextually redefined what is at this point a hazard of *life* in the United States

---

[2] The states arguing in support of the stay put it this way: If Congress does not have the power under the Commerce Clause to force individuals to buy health insurance, could it make an end-run around that rule by telling employers that they cannot retain uninsured employees? And if Congress cannot do so, then why can it tell employers that they cannot retain *unvaccinated* employees?

and throughout the world—COVID-19—as a hazard of the workplace. *See, e.g.*, 86 Fed. Reg. at 61,545 (misleadingly characterizing COVID-19 as a "workplace hazard"). It engages in this pretext in its attempt to bring a traditional matter of state concern—compulsory vaccination—within the ambit of federal jurisdiction. But caselaw is clear. Neither Congress nor OSHA may pretextually relabel such an area as "commerce" to gain what is, in effect, a novel police power of the national government. *See Morrison*, 529 U.S. at 616–18 (rejecting the notion that Congress may regulate domestic violence merely because of a purported "effect on interstate commerce"); *see also id.* at 617–18 ("The Constitution requires a distinction between what is truly national and what is truly local."); *Lopez*, 514 U.S. at 567–68 (rejecting Congress's attempt to relabel firearms near schools a problem of interstate commerce).

## II.

Given that OSHA is so disarmed of precedent, one might reasonably have expected it to come into court bearing historical examples of the power it seeks to exercise—the federal imposition of a *de facto* nationwide vaccine mandate. Yet it has none. To the contrary, the relevant history actually undercuts OSHA's position. For while Congress has long sought to *facilitate* safe and effective vaccines, it has never invoked the commerce power to *mandate* their administration upon the public at large.[3]

In the early years of the Republic, Congress did little to respond to epidemics.[4] In the summer of 1793, for example, yellow fever descended on Philadelphia, then the nation's capital. *See* Letter from Thomas Jefferson to Martha Jefferson Randolph (Sept. 8, 1793), Founders

---

[3]To be sure, the federal government has, at one time or another, mandated vaccination for discrete segments of the population, such as for soldiers or members of the foreign service working abroad. George Washington himself ordered that his soldiers in the Continental Army receive variolation against smallpox in the winter of 1777. *See* Ann M. Becker, *Smallpox in Washington's Army: Strategic Implications of the Disease During the American Revolutionary War*, 68 J. of Mil. Hist. 381, 427–28 (2004). But the relevant question is not whether the federal government has the authority to order the vaccination of certain populations in a special relationship with it. What is at stake here is whether Congress has a general police power to mandate vaccination for tens of millions of private citizens with *no* special relationship to the federal government. History suggests that it has no such power.

[4]And when it did intervene, it did not impose unilateral mandates upon the states, but instead assisted in a cooperative fashion. *See* Act of May 27, 1796, 4 Cong. Ch. 31, 1 Stat. 474 (authorizing the President to "aid in the execution of quarantine, and also in the execution of the health-laws of the states" during a yellow-fever epidemic).

Online, https://founders.archives.gov/documents/Jefferson/01-27-02-0060 (last visited Dec. 12, 2021); *see also* Letter from George Washington to Edmund Randolph (Sept. 30, 1793), Founders Online, https://founders.archives.gov/documents/Washington/05-14-02-0105 (last visited Dec. 12, 2021); James Higgins, "Public Health," Encyclopedia of Greater Philadelphia, https://philadelphiaencyclopedia.org/archive/public-health/ (last visited Dec. 12, 2021); Mathew Carey, *A Short Account of the Malignant Fever, Lately Prevalent in Philadelphia* 11 (1794), available at Harv. Univ. Lib. Viewer, https://iiif.lib.harvard.edu/manifests/view/drs:7374219$11i (last visited Dec. 14, 2021) (describing the "destroying scourge, the malignant fever," that had "crept in among us").  The federal government's response was primarily to leave town for the countryside.  *See* Letter from Thomas Jefferson to Martha Jefferson Randolph, *supra.* President Washington chose to work remotely at Mount Vernon; the Secretary of State, Thomas Jefferson, fled to Monticello.  *Id.*

There was no vaccine available in the 1790s for yellow fever but, in 1796, Sir Edward Jenner discovered a vastly improved vaccination for smallpox—rather than use live virus as had the earlier "variolation" process, Jenner used cowpox instead.  *See* Stefan Riedel, *Edward Jenner and the History of Smallpox and Vaccination*, 18 Baylor U. Med. Ctr. Proceedings 21, 23–24 (2005).  That discovery led Congress less than two decades later, in 1813, to enter the vaccine arena.  *See* Tess Lanzarotta & Marco A. Ramos, *Mistrust in Medicine: The Rise and Fall of America's First Vaccine Institute*, 108 Am. J. of Pub. Health 741 (2018). In response to an outbreak of smallpox, Congress passed "An Act to Encourage Vaccination," sometimes called the Vaccine Act of 1813. *Id.* at 742; *see also* James Colgrove, *Immunity for the People: The Challenge of Achieving High Vaccination Coverage in American History*, 122 Pub. Health Rep. 248, 249 (2007).

The Act had three salient features: it created the position of a federal vaccine agent, gave him the authority to curate an unadulterated supply of smallpox vaccine, and gave him a franking privilege to distribute vaccines to those who requested them, free of charge, through the U.S. mail. *Id.*  Noted Maryland physician James Smith served as the nation's first (and only) vaccine agent for nine years, overseeing "twenty agents nationwide who inoculated around 100,000

people" during his tenure. *See* Letter from James Smith (of Baltimore) to Thomas Jefferson (Mar. 28, 1818), Founders Online, https://founders.archives.gov/documents/Jefferson/03-12-02-0472 (last visited Dec. 12, 2021). Yet Smith's role as vaccine agent—and the Vaccine Act itself—came to a tragic end in 1822. *See* Lanzarotta & Ramos, *supra*, at 742. Smith accidentally shipped packages of live smallpox (rather than cowpox vaccine) to the town of Tarboro, North Carolina, resulting in ten fatalities. *Id.* Two months later, President Monroe dismissed Smith from his position and Congress repealed the Act, relinquishing further vaccination efforts to the states. *Id.*

Public response to the vaccine was strikingly similar to modern attitudes about the COVID vaccine. Many voluntarily took the smallpox vaccine and gave it to their children. *See, e.g.*, The Diaries of Gouverneur Morris: New York 1799–1816, 777 (Melanie Randolph Miller, ed. 2018); *see also* Letter from Abigail Adams to John Adams (July 13, 1776), Mass. Hist. Society, https://www.masshist.org/digitaladams/archive/doc?id=L17760713aa (last visited Dec. 14, 2021). But others, like some today, were suspicious of a vaccine. *See* Cynthia M.A. Geppert & Reid A. Paul, *The Shot That Won the Revolutionary War and Is Still Reverberating*, Fed. Practitioner 298, 298 (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6654165/pdf/fp-36-07-298.pdf (last visited Dec. 14, 2021). And smallpox was as devastating and transmissible, if not more so, than COVID-19. *See* "History of Smallpox," Centers for Disease Control and Prevention, https://www.cdc.gov/smallpox/history/history.html (last visited Dec. 12, 2021). Yet there is no indication that anyone in the 1813 Congress thought the federal government had a general police power to nationally mandate vaccination.

Congressional involvement in vaccination ever since has followed the basic contours of the 1813 regime. Congress has passed many laws to regulate the purity of vaccines, facilitate their distribution with information and funding, and compensate those injured by their administration, but it has apparently never invoked the commerce power[5] to *mandate* their

---

[5]I pause to note a seeming counterexample that is, upon further inspection, no counterexample at all. In 1832, Congress passed the Indian Vaccination Act—a functional vaccine mandate for those tribes selected for smallpox vaccination by federal Indian agents. *See* J. Diane Pearson, *Lewis Cass and the Politics of Disease: The Indian Vaccination Act of 1832*, 18 Wicazso Sa Rev. 9, 12 (2003) (noting that "it was left to the secretary of war to

imposition upon the general public. *See, e.g.*, Biologics Control Act, Pub. L. No. 57-244, 32 Stat. 728 (1902) (current version at 42 U.S.C. § 262 (2006)); *see also* Pure Food and Drug Act of 1906, Pub. L. No. 59-384, 34 Stat. 768; Virus-Serum-Toxin Act, ch. 145, § 1, 37 Stat. 832 (1913) (current version at 21 U.S.C. §§ 151–159); Federal Food, Drug, and Cosmetic Act, Pub. L. No. 75-717, 52 Stat. 1040 (1938); Public Health Service Act, Pub. L. No. 78-410, 58 Stat. 682 (1944); Poliomyelitis Vaccination Assistance Act of 1955, Pub. L. No. 277, 69 Stat. 704; National Childhood Vaccine Injury Act, Pub. L. No. 99-660, 100 Stat. 3755 (1986); Food and Drug Modernization Act of 1997, Pub. L. No. 105-115, 111 Stat. 2296.

The Poliomyelitis Vaccine Assistance Act of 1955 provides a good example. Soon after Dr. Jonas Salk developed the first effective polio vaccine in 1955, Congress responded with millions of dollars in "grants to assist states in vaccinating children under 20 and expectant mothers," with funds "allotted to the states" according to their respective needs. *See* Otis L. Anderson, *The Polio Vaccine Assistance Act of 1955*, 45 Am. J. Pub. Health 1349, 1349 (1955). Yet it was "the *states* [that had] responsibility for the intrastate distribution of the vaccine through both public agency and normal commercial channels." *Id.* (emphasis added); *see also* 42 U.S.C. § 243(a) (directing the Secretary of Health and Human Services to "*assist* States . . . in the prevention and suppression of communicable diseases" and to "*cooperate with* and *aid* State and Local authorities." (emphases added)).

OSHA would turn this history on its head. It proposes not a partnership in which the federal government simply encourages vaccination, but an unfunded mandate in which half our workforce must either become vaccinated or subject itself to regular out-of-pocket testing. *See* 86 Fed. Reg. at 61,532. If Congress purported to delegate such a sensitive "money or lives"

---

determine which American Indians were vaccinated and when and where they would be vaccinated. American Indians had no input into any of the political or decision-making processes involved with the bill or into implementation of the act."). The Act's marketing was beneficent, *id.* at 10, but its administration was sinister. Indian agents selected for vaccination (1) those tribes scheduled for removal, so that smallpox would not derail the journey, *id.* at 25, and (2) tribes that were considered valuable trading partners of the United States. *Id.* at 19–23. By contrast, tribes considered "beyond the pale of civilization" were deliberately excluded from vaccination. *Id.* at 20. Even if a modern agency were inclined to rely on this poisoned precedent, *see Ramos v. Louisiana*, 140 S. Ct. 1390, 1401 & n.44 (2020), it would do nothing to advance an interpretation of the Commerce Clause. Congress regulates Indian tribes' internal affairs under a supposed "plenary power"—much as a state would regulate its own citizens—rather than under its commerce authority. *See Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 70 (2016).

determination to an unaccountable agency, we would have to think hard about the propriety of that delegation. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring in the judgment). Yet here there likely existed no authority to delegate.

### III.

I have no doubt that the pandemic imperils our society, and I recognize that there is sometimes a "judicial impulse to stay out of the way in times of crisis." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 71 (2020) (Gorsuch, J., concurring). But while an "emergency may afford a reason for the exertion of a living power already enjoyed," it cannot "call into life a power which has never lived." *Wilson v. New*, 243 U.S. 332, 348 (1917). OSHA claims just such a power—history and precedent notwithstanding. It is surely incumbent on the third branch in these circumstances to check the actions of the "fourth." And because the full court should have had the opportunity to do so, I respectfully dissent.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk